**UNITED STATES of America,**
**Plaintiff,**

v.

**EMPLOYING PLASTERERS ASSOCIA-**
**TION OF CHICAGO et al.,**
**Defendants.**

No. 52 C 1640.

United States District Court
N. D. Illinois, E. D.
Jan. 31, 1956.

Earl A. Jinkinson, Charles W. Houchins, Robert L. Eisen, Raymond C. Nordhaus, Chicago, Ill., for plaintiff.

Daniel D. Carmell, Chicago, Ill., for defendants Local No. 5 and Byron W. Dalton.

Howard Ellis, Thomas M. Thomas, Don Reuben, Chicago, Ill., for defendant Employing Plasterers Association of Chicago.

PERRY, District Judge.

The United States brought this civil action, charging the defendants with having conspired to violate Section 1 of the Sherman Act, 15 U.S.C.A. § 1. By way of summary, the Government's complaint alleges:

"Defendants are (1) a Chicago trade association of plastering contractors; (2) a local labor union of plasterers and their apprentices; (3) the union's president. These contractors and union members employed by them do approximately 60% of the plastering contracting business in the Chicago area of Illinois. Materials used in the plastering, such as gypsum, lath, cement, lime, etc., are furnished by the contractors. Substantial quantities of this material are produced in other states, bought by Illinois building materials dealers and shipped into Illinois, sometimes going directly to the place of business of the dealers and sometimes directly to job sites for use by the plastering contractors under arrangements with the dealers. The practical effect of all this is a continuous and almost uninterrupted flow of plastering materials from out-of-state origins to Illinois job sites for use there by plastering contractors. Restraint or disruption of plastering work in the Chicago area thus necessarily affects this interstate flow of pastering materials adversely. Since 1938 the Chicago defendants have acted in concert to suppress competition among local plastering contractors, to prevent out-of-state contractors from doing any business in the Chicago area and to bar entry of new local contractors without approval by a private examining board set up by the union. The effect of all this has been an unlawful and unreasonable restraint of the flow in interstate commerce of materials used in the Chicago pastering industry."

It is alleged that continuously since 1938 a local group of people were to a large extent able to dictate who could and who could not buy plastering materials that had to reach Illinois through

interstate trade if they reached there at all.

Although it has been alleged that the interstate flow of building materials has been unlawfully restrained by the alleged conduct of the defendants, prior to the trial it was admitted by the Government by virtue of stipulation and certain Government responses to appropriate discovery proceedings, that there was no effect upon such interstate flow of building materials, either dollar-wise, volume-wise, or quality-wise during the period in question. The Government has prosecuted and now rests its case solely upon the theory that the defendants' alleged conduct has unlawfully restrained competition among plastering contractors in the Chicago area.

In support of its complaint, the Government points to four separate situations: (1) Article VI, Section 2 of the joint agreement between the defendant Association and the defendant Local No. 5; (2) certain events which occurred during the course of the construction of the Altgeld Gardens housing project for the federal government; (3) the construction of a Tuberculosis Sanitarium for the State of Illinois and of a Veterans Hospital for the federal government; (4) Section 96 of the constitution and by-laws of Local No. 5 relating to the qualifications and requirements of prospective plastering contractors.

### Findings of Fact

1. It is the Government's position that Article VI, Section 2 of the joint agreement between the defendant Association and the defendant Union, which sets forth what is termed the "original contractor" rule, constitutes a per se violation of the Sherman Act. This provision, as set out in the 1945 agreement, reads as follows:

"The original contractor shall finish the job and every part thereof for which he has a contract, including all extra work in connection with such contract or job. Final payment on said contract shall be conclusive evidence of the conclusion of said contract."

The evidence in this respect does not sustain the Government's position. It shows clearly that this agreement and the recited provision did not arise out of any conspiracy allegedly formed in 1938 among the defendants to restrain competition among plastering contractors. Historically, it dates back to 1912 when it was incorporated into the agreement between the Association and the local union as a result of a jurisdictional dispute between the defendant union and the ornamental plasterers and casters union. A practice had developed among the plastering contractors to sub-contract the casting and erection of ornamental plaster to shops which had no contractual relation with Local No. 5. Such contractors began to use casters from the rival ornamental plasterers' union. In order to avoid this, Local No. 5 in its contract with the plastering contractors, provided that the original contractors had to complete all the work for which the contract had been written, thereby preventing the sub-contracting of ornamental work to the rival union.

The evidence shows no other purpose for this "original contractor" provision and, as hereinafter will be set out, it has never been used for any other purpose.

This Court finds that the agreement did not come about as a result of a conspiracy between the defendants and has never been so used. It concludes that the agreement is not a per se violation of the Sherman Act. On the contrary, the agreement assures the attainment of a proper objective which, it appears to this Court, is consistent with sound labor policy and labor law and which ultimately can serve to promote more favorable labor relations and thereby indirectly foster a more continuous and undisturbed flow of building materials in the stream of commerce; and, more particularly, it discourages jurisdictional labor disputes, often disastrous in economic and social consequences to employers and to the general public.

2. In April, 1944, George W. Humphrey had the plastering contract at the Altgeld Gardens project in Chicago, Illinois. The specifications called for plastering not less than ½ inch thick and for a three-coat operation.

Humphrey testified that he fulfilled the three-coat requirement of the contract by the use of a "double-back" system—a method whereby the first scratch coat is applied, scratched, and then, before this coat is completely dried, followed shortly by the second or brown coat and then later, and after completely drying, by the third or white coat. This method is novel to the trade. An architect, called on behalf of the Government, knew of no such method. All other experts testified that it was nonexistent. The standard three-coat method consists of the application of three separate coats only after each prior coat is fully dried. The "double-back" system, as employed by Humphrey, resulted in a thinner plaster because the second coat, being applied while the first is not completely dried, is absorbed by the first coat and merges into the latter, giving the appearance of being two coats.

When Humphrey began this contract, Neidhardt was the business agent of Local No. 5 for this job. Due to the Union practice of rotating territories every six months, the defendant Dalton began to serve the Altgeld Gardens territory as business agent in June, 1944. About six weeks thereafter, Dalton observed the Humphrey "double-back" operation and insisted that Humphrey perform in accordance with the specifications and Union rules—namely that he use the standard three-coat method, applying each only after the prior coat is fully dried and that the plaster measure at least ½ inch thick. It was Dalton's position that Humphrey's operation did not give a true three-coat job and that the thickness of the plaster did not meet requirements. This led to a bitter controversy between Humphrey and Dalton and gave rise to an antagonism between these two individuals which was apparent even eleven years later in this court during the course of these proceedings. Both persons testified and their testimony is not in agreement as to what happened during the summer of 1944 at Altgeld Gardens. It is significant to this Court that the Government failed to call Neidhardt, Dalton's predecessor as business agent, and particularly the governmental inspectors who examined the Altgeld operation during its construction. The evidence reflects clearly that Neidhardt was on the job only three times. He had problems with Humphrey over the periodic discharging of men. Dalton was insisting upon compliance with union regulations which are based upon the standards as announced by the United States Bureau of Standards. From all the evidence, the Court finds that Dalton's criticism was warranted and not arbitrary.

From the evidence, the Court finds that Humphrey, by use of the "double-back" system, was not giving the federal government the three coats of different material and of the thickness required by the contract and specifications but was, in fact, performing a two-coat job inasmuch as he applied the second coat both of the same material and before the first was fully dried, thereby causing a merger of the first two coats into one.

Certain exhibits of Altgeld Gardens plaster were admitted into evidence and were in no way disputed. They show clearly the thickness and quality of the plastering done by Humphrey before Dalton came upon the job and the thickness and quality of that performed by Humphrey after Dalton entered upon the job. From these exhibits, the Court finds that the thickness of plastering done during the pre-Dalton period varied from ⅜ to 7/16 of an inch and that none of it had the minimum ½ inch thickness as required by the specifications; and the Court further finds that the plastering done by Humphrey, after Dalton's arrival and insistence upon compliance with the specifications, consisted of three separate coats, each applied after the prior one was fully dried, and was at least ½ inch thick and in all respects complied with the specifications. The

Court further finds that the specifications for the plastering work to be done by Humphrey on the Altgeld Gardens project required three coats consisting of three different grades of material; that the plastering done by Humphrey before defendant Dalton became business agent supervising the project consisted of two coats of different materials, the first coat consisting of two "double-back" applications of the same grade material, not consistent with said specifications; that after defendant Dalton became business agent on the Altgeld project and at defendant Dalton's insistence, Humphrey caused three coats of plaster of different grade to be applied on the project in accordance with said specifications and that in so doing the defendant Dalton was carrying out his duties and in fact rendering a public benefit and was in no way conspiring with defendant Local No. 5 or the defendant Plasterers Association to restrain interstate commerce.

This controversy gave rise to a bitter labor dispute between Humphrey and Local No. 5. Three to four hundred plasterers were used on this job. Humphrey discharged forty or fifty men. On one occasion he refused to allow the group of assigned plasterers to work for a day "just to show who was boss." Two of Humphrey's supervisors were fined by the union for "racing" the men.

By Humphrey's testimony, the Government has attempted to prove that Dalton coerced or attempted to coerce Humphrey. The government points to a conversation between these individuals in September, 1944, a full month after their controversy over the "3 coats". Dalton denies any such action. This Court observed the demeanor of both individuals very carefully during the course of their testimony. Humphrey impressed the Court as a very honorable man but one whose testimony was tinged with bitterness toward Dalton over their controversy on the Altgeld project. There is no doubt that Dalton is·a positive individual, yet he impressed the Court and the evidence shows him as being a person of integrity who undertakes his official union duties sincerely and seriously and who performs such duties diligently and vigorously. The Court finds from the evidence that Dalton did not coerce or attempt to coerce Humphrey. At most, he indulged in a colloquialism to impress Humphrey with the current strong position of union labor in the building trades; that when he stated that labor could get away with murder he used the expression in the same manner that this very common phrase is used everywhere in the United States of America to emphasize the influence of a person or organization and that he did not use the phrase in any threatening manner.

The Court further finds that the difficulties at the Altgeld Gardens project arose out of a labor dispute and that the union and its representatives were pursuing proper union objectives. The evidence reveals no discrimination against, impeding or harassment of out-of-state plasterers and contractors; it is to the contrary. Humphrey himself admitted that he was never restricted as to the use of out-of-state plasterers; that he used out-of-state plasterers, and that his contracting activity was not restricted in the Chicago area. Humphrey admits that he has continued to perform work as contractor in the Chicago area down to the present day. By his own testimony he has had over fifty jobs in the Chicago area. Humphrey has also admitted that he experienced no difficulty with either Dalton or Local No. 5 at the 91st Street project or any other of the fifty jobs. This admission is not consistent with any charge that the union, Dalton and others were conspiring to discriminate against and harass out-of-state contractors and employes.

Humphrey claimed a loss of $137,222.-05 on the Altgeld Gardens project because of the activities of defendants Dalton and Local No. 5 as above set forth, and admits he compromised it for $65,-000. The evidence regarding this loss is not only incomplete but consists solely of the statement of Humphrey, without any evidence from his books and records, and

with no evidence as to the rise in costs which took place during the performance of the contract or whether he bid for the work on terms too low, or other facts.

Finally, the Court finds from the evidence that there was no conspiracy between the defendant Association and defendant Local No. 5 and its representatives to discriminate against, impede or harass out-of-state contractors and plasterers. The evidence is crystal clear that the Association and its members knew nothing of any of the difficulties at the Altgeld Gardens project whatsoever until after this lawsuit was filed, which was some eight years after the controversy between Humphrey and Dalton.

3. The next controversy, upon which the Government rests its case, centers about a dispute that occurred some seven years later between Local No. 5 and Byron Dalton, on the one hand, and the Derby Plastering Company during the course of the construction of a Tuberculosis Sanitarium for the State of Illinois and the Veterans Hospital for the federal government. Simmons Company, which was the general contractor, had originally awarded the plastering contract to J. J. Brown, a member of the defendant Employing Plasterers Association. A number of delays, beyond the control of J. J. Brown, caused his beginning the plastering operation eighteen months late. The Korean conflict, with its consequent shortage of building materials as well as a periodic rise in labor costs, resulted in an increase in Brown's costs. Brown sought to recover his increased costs. The Simmons Company, however, refused to renegotiate, and eventually terminated the contract. Brown had already started the plastering operation at the Sanitarium but did not complete it. Upon the termination of the contract, Brown claimed that $10,000 was due him and filed notice of his mechanic's lien in accordance with the law.

The Simmons Company had to negotiate a new plastering contract in order to complete the project. In this regard, Miller, who was Derby's superintendent and general manager and who had also worked in the same capacity for Humphrey at the Altgeld Gardens, testified that Local No. 5 and Byron Dalton were most cooperative at all times. Simmons, the president of the corporation, testified that, upon Dalton's initiative, a meeting was held at Dalton's office at which time he offered his help to settle the difficulty and to have the Sanitarium and Veterans Hospital jobs started and continued. The evidence shows that Dalton and his union offered plasterers to any contractor, local or out-of-state, to be used in the completion of the work. Dalton and his union, in the alternative, offered to provide men directly to the Simmons organization so that it might continue the plastering operation, thereby obviating the need for a sub-contractor, which offer was refused.

The evidence reflects that the Simmons organization solicited bids for a new plastering sub-contract and, in doing so, restricted itself to a group of ten plastering contractors, the majority of whom were members of the defendant Association. This first solicitation bore negative results. In a second attempt, the Simmons organization restricted itself to the same group, although there were more than 150 contractors in the Cook County area. Three out of the ten contractors contacted insisted that the Brown claim be adjusted or that the job be released from any such claim before they undertook to continue the project. Other contractors, for business reasons of their own, responded but declined to bid.

The evidence further indicates that in Chicago the Simmons Company contacted one Schold, a plastering contractor from Minneapolis, Minnesota. At the time of this contact, however, the Simmons organization had a firm agreement with the Derby Plastering Company which eventually continued the work. After he was approached by the Simmons representative, Schold communicated with Dalton to ascertain the position of the union in this matter. When Dalton received the letter, however, the con-

tract had already been awarded to the Derby Plastering Company.

The contract with the Derby Plastering Company was signed on October 11, 1951 and it was so reported to Dalton, whereupon a crew of ten out-of-state plasterers was sent in to begin the work. During the latter part of October this company initiated attempts to negotiate with Local No. 5 a collective bargaining agreement which was finally executed on November 9. After that date Local No. 5 supplied men to Derby as they were needed. There is no evidence that either Local No. 5 or Dalton in any way hampered, interfered with or in any way penalized Derby for taking over the job, or in any way discriminated against Derby because of the use of out-of-state plasterers. As a matter of fact, the evidence clearly shows that throughout the entire plastering operation on this project, out-of-state plasterers were being employed.

During the period that the Derby organization began its work and the signing of the collective bargaining agreement, work was being performed without the use of the union sticker and without a steward, contrary to union regulations. Long, who was Derby's foreman, admitted this and further stated that it was his duty to obtain the sticker. It was discovered by representatives of Local No. 5 when they became cognizant of this operation. When Dalton as business agent came upon the premises he and supervising officials detected faulty workmanship which resulted in numerous cracks in the walls.

Plasterers who were employed by Derby during this period testified on behalf of the Government. They were defensive and sought to explain away, excuse, and rationalize the defective workmanship. The most vocal witness was Felkins, Sr., who, during the course of his testimony, was impulsive and openly antagonistic. In the face of documentary evidence to the contrary, Felkins insisted upon denying that he had ever been previously subjected to disciplinary action by the union. Union records introduced in evidence, however, indicate that he was disciplined twice for misappropriating union funds in the amounts of $26 and $200. The Court finds from all the evidence that Felkins, Sr., was thoroughly discredited on the witness-stand; his testimony stands impeached and is of no value to this Court in these proceedings.

Dryden, another employe of the Derby organization, impressed the Court with his honesty and frankness in discussing earlier personal weaknesses. Substantially, his testimony amounts to an admission that the crew of Louisville men, of which he was a member, was sent in by the Derby organization to do a quick and cheap job. He characterized it as a "shyster" job.

On the basis of the evidence before this Court, there can be no dispute that the workmanship of the Louisville plasterers at the Sanitarium project was poor. Inspectors and architects who examined the building on behalf of the State of Illinois condemned the work; the plastering in the basement, first and eighth floors had to be torn out and replaced. In this court, the Simmons Company is currently prosecuting a lawsuit against the Derby organization, seeking damages caused by the poor workmanship of Derby employes at the TB Sanitarium.

Shortly, charges were filed by the union officials against six of the twelve out-of-state plasterers for violations of union regulations and faulty workmanship. The defendant Dalton volunteered to intercede for any of the six who desired to pick up his traveling book and leave. One did so. Four were fined $98 each and were forbidden to do any work for the Derby Company for a period of one year, which order was disregarded by the Derby Company and all parties concerned. Because of his truthfulness before the union disciplinary board, Dryden was not fined. The fines were eventually remitted at the national convention solely on the ground, however, that the local union proceedings were defective procedurally in that proper notice had not been served upon the members.

The Government has laid great emphasis upon a conversation between the defendant Dalton and Long just prior to the disciplinary proceedings. Long testified that Dalton shook his hand warmly and "did not want to see him hurt." Long impressed this Court as a person who executes the mandates of his superiors meticulously and more or less automatically. This Court does not accept the sinister connotation which the Government attaches to this statement. It is the view of this Court, and the Court finds, that the defendant Dalton was speaking to Long in a very colloquial fashion and was endeavoring to help a fellow union member in avoiding a situation which tended to injure his reputation and standing within the union.

Eventually the Derby Company employed Joseph Powers, a member of defendant Local No. 5, as its superintendent. The work on the Sanitarium was completed and he thereafter directed the plastering operation at the Veterans Hospital which the Derby Company had also contracted to do. The Court finds that no pressures were exerted by either Local No. 5 or Dalton to bring about the employment of Joseph Powers. As a matter of fact, the Derby Company requested Dalton to recommend some person for this purpose. It is significant that no work had to be redone at the Veterans Hospital or the Sanitarium after Powers assumed supervision. It is most significant, and the evidence clearly shows, that the Derby organization requested Powers to supervise a major project in Detroit. This same organization requested Powers to use Chicago plasterers on the Detroit project, if possible.

The income tax returns of the Derby Company, for what they are worth as evidence, reflect a loss on the Sanitarium project of $15,000 and a profit on the Veterans project of $48,521, leaving a net profit on the two jobs in the Chicago area. This court finds that the loss on the Sanitarium project is not attributable to the expulsion of 5 Louisville plasterers but rather to the correction and replacement of the condemned work, caused by their poor workmanship. The same income tax returns further reflect that the Derby organization realized a net profit only in the Chicago area. It lost money on every job outside of this area.

The Court finds that the defendants Local No. 5 and Dalton did not discriminate against the Derby organization and its out-of-state plasterers for the purpose of protecting and conserving the interests of J. J. Brown, namely, Derby's predecessor. The evidence shows, on the contrary, that Local No. 5 and Dalton were cooperative in providing a replacement for J. J. Brown so that the project might continue.

The Court finds from the evidence that none of the defendants ever discriminated against or harassed the Derby organization or any out-of-town employes. The testimony of Simmons' own agent reflects that, at the time of the termination of the Brown sub-contract Dalton cooperated and offered man-power so that an early negotiation of a new sub-contract could be effected. Only guilty out-of-state employes of the Derby organization were censured. Throughout the entire Sanitarium project, out-of-state plasterers were on the job. The Derby organization, having requested assistance, accepted Dalton's recommendation as to Powers and it was so satisfied that it invited Powers and his Chicago staff to proceed to Detroit and work on a major project in that area. This is not consistent with any ill feeling that would naturally arise from any alleged harassment or discrimination by the local union officials against Derby and its out-of-state employes. It is most significant and even surprising to this Court that no technical representative of the Derby organization, the alleged victim of discrimination and harassment, was called by the Government. On the whole, the evidence leaves the clear impression that the relationship between Derby and the local Union was a satisfactory one. This is understandable in view of the fact that only the Chicago operations yielded a net

profit for the Derby organization. It should also be remembered that the workmanship at the Veterans Hospital under the direction of Powers and his staff was satisfactory and needed no replacement.

The Court finds from the evidence that the difficulties between the Derby Company and some of its employes and the defendants Local No. 5 and Dalton at the beginning of the Sanitarium project arose not out of any intention on the part of these defendants to discriminate against and harass the Derby Company and its out-of-state employes but solely out of a bona fide labor dispute by reason of violation of union regulations and poor workmanship. The union in its actions was pursuing proper objectives. The evidence as to this point has been previously reviewed and is so clear that it requires no further discussion.

■ The Court finds from the evidence that no conspiracy, as alleged in the complaint, existed among any of the defendants to discriminate against or harass the Derby company or any out-of-state employes. The evidence is clear that the defendant association had no knowledge of the labor problems at the Sanitarium project, did not participate therein, and did not in any manner whatsoever approve or ratify the actions of either Local No. 5 or Dalton. The evidence further shows that contractors, who were bidding in these jobs after the Brown contract was terminated, merely sought an assurance that their expenses would be paid and that they would not in any way be prejudiced by the existence of the Brown lien. Local No. 5 and Dalton, however, were continuously offering their assistance in having the jobs at the Sanitarium and Veterans Hospital resumed.

There is no evidence of any difficulty during the course of the Veterans Hospital operation. After Powers had completed the plastering work at the Sanitarium, he proceeded to the Veterans Hospital and he with his men performed satisfactorily.

4. Finally, the Government complains of Section 96 of the constitution and by-laws of Local No. 5 which relates to qualifications and requirements imposed upon prospective plastering contractors who desire to employ members of Local No. 5. Any such person or firm must be examined by the union examining board as to his knowledge of the fundamentals of plastering and as to his financial ability to meet material bills and payrolls. Such person or firm must furnish a minimum surety bond of $10,000 to insure payment of the members of Local No. 5 at all times. Members of Local No. 5 who desire to become plastering contractors must meet the foregoing requirements and, in addition thereto, must be a member in good standing for at least five years. Under these regulations it is possible for a non-union member to become a plastering contractor without ever having been a journeyman plasterer.

■ This Court finds that the basic requirements are reasonable for the protection of a proper union objective, namely, an assurance that the prospective contractor can perform satisfactorily and is able to discharge all financial obligations. It not only promotes the attainment of a proper union objective but provides a safeguard for the purchaser that the plastering work is good and that his premises will not some day become encumbered by a lien for work performed by plasterers. Though the requirements for local members are more rigid, it is reasonable in that it avoids a dualism in its members, thereby promoting a stability within the union organization and it assures capable workmanship in a member who desires to contract. Furthermore, any member is always able to hire a supervisor who fulfills the foregoing requirements and can thereby achieve the same results.

The record contains no evidence whatsoever that either the defendant Local No. 5 or Dalton employed these regulations in any arbitrary or illegal fashion, either against the local or out-of-state plasterers or contractors.

Finally, the evidence shows clearly that the defendant Employing Association is not concerned with these regulations in any manner whatsoever. The Court finds from all the evidence that the aforesaid regulation was not adopted and promulgated as a result of any conspiracy between the Association and Local No. 5 and Dalton.

### Conclusions of Law

 This Court is aware of the fact that a labor organization is not immune from a finding that it has conspired to interfere with interstate commerce contrary to the anti-trust laws. Such charge, however, must be proven. There must be not merely proof by the preponderance of the evidence, but clear proof of the conspiracy, a restraint and interference with commerce and injury to the public. It is the view of this Court that none is even remotely present in the case before the bar.

 The Court concludes that there is no credible evidence of any conspiracy among the defendants; that the defendants did not conspire in any way to restrain competition, restrict or control the flow of any goods or materials, or restrict or limit the available outlets in the Chicago area for any goods or materials; and that nothing that any of the defendants did had any adverse effect on the flow of any goods or materials, or restrict or limit the available outlets in the Chicago area for any goods or materials; and that nothing that any of the defendants did had any adverse effect on the flow of any goods or materials into Illinois.

The Court finds that everything done by defendant Union and Dalton was in honest pursuit of their trade union objectives and without reference to whether it would hurt or benefit defendant Association or its members, or as a result of any conspiracy between the defendants. The defendant Union treated all contractors alike, whether or not they were members of defendant Association. The Court further finds that the defendant Union did not cause or bring about any slow-down and did not harass or intimidate any contractor or employe at any of the three projects about which evidence was introduced for the purpose of causing a slow-down, penalizing the contractors involved or in pursuance of any agreement or conspiracy with the defendant Association. Any reduction in rate of production or any increase in cost of production, if any, at any of such projects was not due to any conspiracy as alleged in the complaint. Certainly judicial extension of the anti-trust law should not be substituted by a District Court for such proof. That is a legislative matter committed by our constitution to Congress and shall stand as the findings of fact and conclusions of law of this court herein. An appropriate decree dismissing the complaint as to each and all defendants will be entered simultaneously herewith.